IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AT&T CORP., et al.          :     CIVIL ACTION
                            :
        v.                  :
                            :
CORE COMMUNICATIONS, INC.,  :
et al.                      :     NO. 12-7157


MEMORANDUM

McLaughlin, J.                           January 30, 2014

        This case involves the exchange of dial-up internet

traffic between two telecommunications carriers.  AT&T Corp.

("AT&T") and Core Communications, Inc. ("Core") are

telecommunications carriers registered to do business in

Pennsylvania.  Since at least 2004, AT&T sent calls to Verizon

Pennsylvania ("Verizon"), which were then sent to Core in order

for AT&T's customers to connect to the internet.  When Core

received those calls, it connected them with its customers which

were Internet Service Providers ("ISPs").  Core and AT&T have

never had an agreement governing the exchange of this traffic.

Core did not bill AT&T for these calls until 2008, at which time

it sought payment according to Core's long-distance tariff filed

with the Pennsylvania Public Utility Commission ("PPUC").  When

AT&T refused to pay, Core filed a complaint with the PPUC.

        The PPUC attempted to resolve the dispute by applying

federal law.  The PPUC ordered AT&T to pay Core at a rate of

$0.0007 per minute of use ("MOU").  The PPUC based that rate on the FCC's rate caps for the exchange of ISP-bound traffic established in a 2001 Order.  Although ISP-bound traffic is interstate communication over which the FCC has jurisdiction, the PPUC found that it could assert jurisdiction over this dispute involving ISP-bound traffic by applying the FCC's established "rate."  The PPUC ultimately ordered AT&T to pay Core approximately $250,000 for traffic dating back to 2005 by September 18, 2013.[1]

Before the Court is AT&T's Motion for Preliminary Injunction, which is in essence a request to stay the enforcement of the PPUC's orders.  During oral argument, however, the parties agreed that this matter involves only questions of law, and requires no further development of evidence.  The parties agreed that re-briefing of the same legal arguments at a later point would be unnecessary.  The parties had no objection to the resolution of the case on the merits at

---

[1]  On September 4, 2013, following a telephone conference with the Court, the parties agreed that AT&T would not be required to pay Core on September 18, 2013.  The parties agreed that AT&T would not be required to pay until AT&T's motion for preliminary injunction is resolved, but that interest would begin to run on September 18, 2013, as contemplated by the PPUC orders.

this time.  The Court will therefore decide this case on the merits, rather than ruling on the preliminary injunction motion.[2]

AT&T asserts five independent reasons why the PPUC's orders are invalid.  The Court finds that this dispute can be resolved on AT&T's first argument.  AT&T argues that the PPUC did not have jurisdiction to establish a rate for the traffic sent by AT&T to Core.  According to AT&T, the dial-up internet traffic at issue is interstate traffic, over which the FCC has exclusive jurisdiction.  Core and the PPUC argue that the PPUC had jurisdiction to resolve the dispute between Core and AT&T by applying federal law.  They argue that the FCC gave state commissions the authority to set rates for dial-up internet traffic consistent with the FCC's Orders.

The Court concludes that the FCC's jurisdiction over the traffic at issue is exclusive.  ISP-bound traffic is "interstate communication."  The FCC has exclusive jurisdiction over interstate communication, except where authority has been delegated to the states.  The Telecommunications Act of 1996 delegated some authority to state commissions to set rates for

---

[2] The Court notes that there are pending counterclaims asserted by Core, as well as a motion to dismiss those counterclaims filed by AT&T.  Also pending is AT&T's motion to strike parts of PPUC's answer to the complaint.  The Court will address Core's counterclaims and the pending motions in separate orders.

interstate telecommunications traffic, but only in the context
of approval, mediation, and arbitration of interconnection
agreements.  That authority is not relevant here because AT&T
and Core did not have an agreement.

I.   Facts

        The facts in this case are not disputed.  Core is a
competitive local exchange carrier ("CLEC") which operates in
Pennsylvania.  Between 2004 and September 2009, Core's only
customers were Internet Service Providers ("ISPs") which
provided "dial-up" internet connections to at-home internet
users.  Core sold telephone lines to the ISPs over which Core
sent dial-up internet connections.  Compl. ¶ 11.

        AT&T Communications of Pennsylvania, LLC was a company
certified as a CLEC in Pennsylvania which provided local
telephone exchange service and intrastate long distance service
to customers in Pennsylvania.  AT&T Communications was merged
into its parent company, AT&T Corp., in October 2012.  Between
2004 and 2009, AT&T provided telephone exchange service to
Pennsylvania customers, which allowed them to make and receive
calls.  Id. ¶¶ 5, 6, 12.

        Between 2004 and 2009, AT&T's customers placed calls
to Core's ISP customers in order to gain dial up access to the

internet.  All of these calls were local, meaning they
originated and were delivered in the same area.  For each of
these ISP-directed calls, an AT&T customer's call was delivered
by AT&T to Verizon which then delivered the call to Core, and
Core "terminated" the call to the ISP.  Id. ¶¶ 13, 14.

During this time, Core had on file with the PPUC an
"intrastate switched access tariff" that specified Core's rate
for terminating in-state long distance calls.  For this purpose,
long distance calls are defined as a call that originates in one
Pennsylvania "local exchange area" and ends in a different
Pennsylvania "local exchange area."  The tariff does not specify
a rate for calls that begin and are terminated in the same local
exchange area.  Core has had tariffs on file with other state
commissions that specify rates for local calls, but has never
had such a tariff on file in Pennsylvania.  AT&T has never had
contracts with Core establishing a rate for these local calls.
Id. ¶¶ 15-17.

Since 2004, AT&T originated, Verizon delivered, and
Core terminated these ISP-bound calls.  Core did not bill AT&T
for any of these calls until January 2008.  At that time, Core
billed AT&T for calls dating back to 2004 at its state-filed
rate for long distance calls.  AT&T refused to pay the bill.
Id. ¶¶ 19-20.

During this time, AT&T also originated calls that were terminated with CLECs other than Core.  These calls were exchanged on a "bill-and-keep" basis, which means that neither CLEC paid anything to the other for handling local calls.  Under a bill-and-keep system, companies recover costs from their own customers rather than charging each other for the exchange of traffic.  AT&T alleges that it assumed it was exchanging traffic with Core on a bill-and-keep basis as well.  Id. ¶ 21; Pl.'s Mot. at 10.

On May 19, 2009, Core filed a complaint against AT&T with the PPUC, seeking compensation for the local calls at Core's long distance rate.  AT&T moved to dismiss the complaint, arguing that the calls were subject to the exclusive jurisdiction of the FCC.  On May 11, 2011, the Administrative Law Judge (ALJ) issued an initial decision finding that federal law governed the dispute, but that the PPUC had jurisdiction to resolve the dispute by applying federal law.  On December 5, 2012 the PPUC issued a decision which held that federal law, including the ISP Remand Order, applied and that the PPUC had jurisdiction.  The PPUC decided the matter by setting a rate of $0.0007/MOU for all calls that Core terminated for AT&T dating back to May 19, 2005, pursuant to Pennsylvania's four year statute of limitations.  Compl. ¶¶ 24-27.

Both parties petitioned the PPUC for reconsideration. On August 15, 2013, the PPUC issued its Order on Reconsideration ("August 2013 Order"), which denied AT&T's petition.  The PPUC rejected all of the arguments that AT&T raises in its complaint in this case, and ordered AT&T to pay a total of $254,029.89 to Core by September 18, 2013.  Pl.'s Mot. at 2, 11.

II.  <u>Federal Statutory and Regulatory Background</u>

A.   <u>Communications Act of 1934 ("Communications Act")</u>

The Communications Act of 1934 created the FCC and gave it the authority to "regulat[e] interstate and foreign . . . communication by wire and radio."  47 U.S.C. § 151.  The Communications Act divided telephone regulation into two separate components - interstate and intrastate.  The Act gives jurisdiction to the FCC over interstate communication, 47 U.S.C. § 152(a), while preserving the states' power to regulate "intrastate communication service."  47 U.S.C. § 152(b).  The infrastructure of telephone service, however, relies on overlapping interstate and intrastate components.  See <u>Public Utility Comm'n of Texas v. FCC</u>, 886 F.2d 1325, 1329 (D.C. Cir. 1989).  This division of jurisdiction has created a "persistent jurisdictional tension," which is the source of the dispute in this case.  <u>Id.</u>

B.    Telecommunications Act of 1996 ("TCA")

Until 1996, local telephone services were operated by state-authorized monopolies.  The TCA was passed in order to foster competition in the telecommunications industry.  It altered the balance between state and federal regulation by giving the FCC jurisdiction over some traditionally intrastate communication, and by giving states some power over interstate communication.  The TCA sought to encourage competition and reduce regulation by relying on private agreements between the then existing telephone monopolies, labeled "incumbent local exchange carriers" ("ILECs"), and new competitors called "competitive local exchange carriers ("CLECs").  See AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371 (1999); MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania, 271 F.3d 491, 498 (3d Cir. 2001); 1 Peter W. Huber et al., Federal Telecommunications Law § 3.3.4 (2d ed. 1999).

To assist with the TCA's primary reliance on private agreements, it gave state public utility commissions a role in making sure that "local competition was implemented fairly." Huber, supra, at § 3.3.4.  The TCA enlisted state commissions specifically through sections 251 and 252 of the TCA, which are relevant here.  Id.

1.   Section 251

Section 251 imposes several duties on telecommunications carriers.   Much of § 251 is directed toward ILECs, in order to open the market to new competitors.   See MCI Telecomm. Corp., 271 F.3d at 498-99 (explaining the requirements of § 251).   Relevant here, though, is section 251(b)(5) which imposes on all LECs (including CLECs) a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."   47 U.S.C. § 251(b)(5).

Section 251(c)(1) imposes a duty on ILECs specifically to "negotiate in good faith" the "terms and conditions of agreements" to fulfill the duties established in this section. 47 U.S.C. § 251(c)(1).   It imposes the same duty to negotiate in good faith upon the "requesting telecommunications carrier," which was typically a CLEC entering the market.   Id.

2.   Section 252

Section 252 delegates authority to state commissions to oversee the negotiation of interconnection agreements between ILECs and CLECs.   Section 252(a)(1) allows an ILEC to "negotiate and enter into a binding agreement with" other carriers for reciprocal compensation.   47 U.S.C. § 252(a)(1).   Such an agreement is required to include a detailed itemization of

charges.  Id.  These agreements must be submitted to the state
commission for approval.  47 U.S.C. § 252(a)(1), (e)(1).

State commissions are specifically given authority
under § 252 to review, mediate, and arbitrate interconnection
agreements.[3]  Either an ILEC or CLEC that is negotiating an
interconnection agreement with the other can ask the state
commission to mediate the negotiation.  47 U.S.C. § 252(a)(2).
Either carrier can also "petition the state commission to
arbitrate any open issues."  47 U.S.C. §§ 252(b)(1).


C.   The Rise of Dial-Up Internet Service

Following the TCA, CLECs could enter the
telecommunications market to compete with ILECs.  With the
growth of dial-up internet access, CLECs recognized an
opportunity to profit from the regulatory scheme.  See In the
Matter of Implementation of the Local Competition Provisions in
the Telecommunications Act of 1996, Intercarrier Compensation
for ISP-Bound Traffic, 16 FCC Rcd. 9151, 9162 (2001)("ISP Remand
Order").  Historically, the telephone companies in a local area
worked together to complete calls and operated under reciprocal
compensation agreements.  Id.  As the Ninth Circuit explained,

---

[3] Because § 252 is directed toward negotiations between an
ILEC and a CLEC, the provisions in § 252 do not apply to a
negotiation between two CLECs.

the reciprocal compensation scheme is based on the assumption of

an equal exchange of telecommunications traffic:

> When a customer of telephone company A places a local
> call to a customer of telephone company B, the two
> companies cooperate to complete the call.
> Traditionally, the  telephone company of the
> individual receiving the call (company B) would bill
> the originating phone company (company A) for
> completing, or "terminating," the call, on a per-
> minute basis.  When the phone call went in the
> opposite direction – from a company B customer to a
> company A customer – the billing, too, would be
> reversed. Underlying this 'reciprocal compensation'
> arrangement was the empirically-based assumption that,
> over time, the telephone traffic going in each
> direction would even out.

AT&T Comm. of Cal., Inc. v. Pac-West Telecomm, Inc., 651 F.3d

980, 981 (9th Cir. 2011).

         With the exchange of dial-up internet traffic, on the

other hand, company A connects its customer with company B,

which connects the call to an ISP.  Id. at 982.  These phone

calls last substantially longer than a regular phone call, and

the ISP will never return the call.  Id. As CLECs amassed ISPs

as customers, therefore, they could charge the connecting LEC

for lengthy internet calls without ever reciprocating the call.

See ISP Remand Order, 16 FCC Rcd. 9151, 9162 (2001)("ISP Remand

Order").

11

D.   ISP Remand Order

     The FCC sought to address this "regulatory arbitrage"
problem in 2001 in the ISP Remand Order[4] which created a new
compensation scheme for ISP traffic.  See ISP Remand Order, 16
FCC Rcd. 9151, 9156.  As an initial matter, the FCC concluded
that "ISP-bound traffic is jurisdictionally interstate and thus
subject to the Commission's section 201 jurisdiction."  Id. at
9154.  Since the FCC found that ISP-bound traffic falls within
its jurisdiction, it went on to "establish an appropriate cost
recovery mechanism for delivery of this traffic."  Id. at 9153.

     First, the FCC concluded that ISP traffic "is not
subject to the reciprocal compensation obligations of section
251(b)(5)."  Id. at 9154.  Rather, the FCC found that the best
method for cost allocation of ISP traffic is probably a "bill-
and-keep" system, "whereby each carrier recovers costs from its

---

[4] The FCC first addressed the ISP-bound traffic issue in a
1999 Declaratory Ruling, In the Matter of Implementation of the
Local Competition Provisions in the Telecommunications Act of
1996, Inter-Carrier Compensation for ISP-Bound Traffic, 14 FCC
Rcd. 3689 (1999)("Declaratory Ruling").  The ruling established
that ISP-bound traffic is largely interstate, and the reciprocal
compensation scheme is not mandatory for the exchange of ISP-
bound traffic.  Id. at 3703.  Notably, the Declaratory Ruling
discussed at length the authority of state commissions to set
rates.  That authority was discussed solely in the context of
state commission § 252 mediation or arbitration when LECs could
not agree on a rate.  Id. at 3704-06.  The Declaratory Ruling
was vacated by the D.C. Circuit Court of Appeals.  Bell Atl.
Tel. Cos. v. F.C.C., 206 F.3d 1 (D.C. Cir. 2000).

own end-users" instead of collecting from each carrier.  Id.
Because the FCC needed more information before implementing a
complete bill-and-keep system, it established an "interim"
compensation scheme.  Id. at 9155.  Specifically, the FCC
established a declining rate cap on "the amount that carriers
may recover from other carriers for delivering ISP-bound
traffic."  Id. at 9156.

The FCC based its compensation scheme on existing
interconnection agreements.  Id. at 9190-91.  The compensation
scheme began with a cap for intercarrier compensation for ISP-
bound traffic at $0.0015/MOU.  Id.  After six months, the cap
declined to $0.0010/MOU.  Id.  After twenty-five months, the cap
declined to $0.0007/MOU, which was to remain in place until
further FCC action.  Id.  That $0.0007/MOU rate cap remains in
place today.  See In the Matter of High-Cost Universal Serv.
Support Fed.-State Joint Bd. on Universal Serv. Lifeline & Link
Up Universal Serv. Contribution Methodology Numbering Res.
Optimization Implementation of the Local Competition Provisions
in the Telecommunications Act of 1996 Developing A Unified
Intercarrier Comp. Regime Intercarrier Comp. for ISP-Bound
Traffic IP-Enabled Servs., 24 F.C.C. Rcd. 6475, 6489 (2008)("ISP
Mandamus Order").

Additionally, the FCC created a "new markets rule" which required new LECs which were not already party to an interconnection agreement to exchange ISP-bound traffic on a "bill and keep" basis.[5]  <u>Id.</u> at 9188.  It also established "growth caps" that limited the total number of minutes for which a LEC could be compensated for ISP-bound traffic.  <u>Id.</u> at 9187. Finally, the FCC created a "mirroring rule" which required an ILEC to offer to terminate its own traffic according to the rate caps if the ILEC expected to benefit from the rate caps.  <u>Id.</u> at 9193-94.

The FCC emphasized that this scheme established "<u>caps</u> on intercarrier compensation."  <u>Id.</u> at 9188 (emphasis in original).  Thus, the caps had "no effect to the extent that states have ordered LECs to exchange ISP-bound traffic either at rates below the caps . . . or on a bill and keep basis (or otherwise have not required payment of compensation for this traffic)."  <u>Id.</u>

Finally, the FCC declared its intent to preempt state regulation going forward.  Although the FCC did not intend to "alter existing contractual obligations . . . or preempt any state commission decision regarding compensation for ISP-bound

---

[5] A bill-and-keep arrangement effectively has a rate of $0.00/MOU.

traffic for the period prior to" the ISP Remand Order, the FCC
declared that, "[b]ecause we now exercise our authority under
section 201 to determine the appropriate intercarrier
compensation for ISP-bound traffic . . . state commissions will
no longer have authority to address this issue."  Id. at 9189.

     E.   WorldCom, Inc. v. FCC

The D.C. Circuit reviewed the ISP Remand Order in 2002
in Worldcom, Inc. v. F.C.C., 288 F.3d 429 (D.C. Cir. 2002).  The
Court rejected the FCC's reasoning for determining that ISP-
bound traffic did not fall within the reciprocal compensation
scheme in § 251(b)(5).  Id. at 430.  Nonetheless, the Court
determined that there were probably "other legal bases for
adopting the rules chosen by" the FCC, so the Court remanded the
matter to the FCC without vacating the rules.  Id.

     F.   Core Forbearance Order

On October 18, 2004, the FCC partially granted a
petition by Core to forbear from enforcing the provisions of the
ISP Remand Order.  See Petition of Core Comm., Inc. for
Forbearance under 47 U.S.C. § 160(C) From Application of the ISP
Remand Order, 19 FCC Rcd 20179, 20186 (2004)("Core Forbearance
Order"), aff'd In re Core Communications, Inc., 255 F.3d 267

15

(D.C. Cir. 2006).  Core sought to have the FCC forbear from enforcing the entirety of the interim compensation scheme established in the ISP Remand Order including the rate caps, the growth caps, the new markets rule, and the mirroring rule.  Id. at 20182.  The FCC granted Core's request to forbear from enforcing the new markets rule and the growth cap rule, which it found were no longer in the public interest.  Id. at 20186.  The rate caps and mirroring rule remained in effect.  Id.

G.   Mandamus Order

The FCC finally addressed the D.C. Circuit's remand of the ISP Remand Order in 2008.  See ISP Mandamus Order, 24 FCC Rcd. 6475.  In the ISP Mandamus Order, the FCC reexamined whether ISP-bound traffic is subject to the reciprocal compensation requirement in § 251(b)(5).  Id. at 6479-80.  The FCC determined that since the D.C. Circuit held that ISP-bound traffic does not fall within the exception of § 251(g), such traffic does fall within the scope of § 251(b)(5).  Id.  This ruling, however, did not undermine the FCC's determination that ISP-bound traffic is interstate in nature and subject to its § 201 authority.

As to the FCC's continued jurisdiction over charges for ISP traffic, the ISP Mandamus Order stated:

>[A]ddressing ISP-bound traffic through the section 251
>framework does not diminish the Commission's
>independent jurisdiction or authority to regulate
>traffic under other provisions of the Act.
>Specifically, we retain our authority under section
>201 to regulate ISP-bound traffic, despite
>acknowledging that such traffic is section 251(b)(5)
>traffic.  With respect to interstate services, the Act
>has long provided us with the authority to establish
>just and reasonable "charges, practices,
>classifications, and regulations."  The Commission
>thus retains full authority to regulate charges for
>traffic and services subject to federal jurisdiction,
>even when it is within the sections 251(b)(5) and
>252(d)(2) framework.

Id. at 6484.  The FCC further declared that ISP-bound traffic is

"clearly interstate in nature" and that the FCC "unquestionably

has authority to regulate intercarrier compensation with respect

to . . . ISP-bound traffic."  Id. at 6483.

Having reaffirmed its jurisdiction over ISP-bound

traffic, the FCC explained the limitations on the authority of

state commissions over this type of traffic.  The FCC

acknowledged that sections 251 and 252 of the TCA altered the

balance between state and federal regulation of

telecommunications, giving state commissions authority to

address some interstate issues through their sections 251 and

252 delegated powers.  Id. at 6483.  The FCC recognized state

commissions' authority over ISP-bound traffic only in the

context of sections 251 and 252 of the TCA and declared that the

state authority provided in those sections shall not be

17

"construed to limit or otherwise affect the [FCC's] authority under section 201." Id. at 6484 (quoting 47 U.S.C. § 251(i)).


   H.   Ninth Circuit's Decision in Pacific Bell

         In 2011, the Ninth Circuit interpreted the ISP Remand Order in AT&T Comm. of California, Inc. v. Pac-West Telecomm, Inc., 651 F.3d 980 (9th Cir. 2011). AT&T and Pac-West were both CLECs licensed in California. AT&T v. Pac-West, 651 F.3d at 988-89. Pac-West had intrastate tariffs on file with the California Public Utilities Commission ("CPUC") which were to apply to locally dialed traffic that was not covered by an interconnection agreement. Id. at 988. AT&T and Pac-West did not have an interconnection agreement, but they exchanged traffic with each other nonetheless. Id. The traffic at issue involved calls that AT&T originated and that Pac-West terminated to ISPs. Id. at 988-89.

         After several years during which Pac-West did not bill AT&T for the traffic, Pac-West billed AT&T and AT&T refused to pay. Id. at 989. At that point, Pac-West requested to negotiate an interconnection agreement with AT&T for that traffic. Id. AT&T refused, asserting that it had no obligation to enter into an interconnection agreement, and that it would

18

prefer to continue to exchange traffic on a bill-and-keep basis, pursuant to the "new markets rule."  Id.

Pac-West then filed a complaint with the CPUC, alleging that AT&T owed it millions in reciprocal compensation for the ISP-bound traffic.  Id.  The CPUC held that the "new markets rule" did not apply in an exchange of traffic between two CLECs without an interconnection agreement, and ordered AT&T to pay Pac-West at the local tariff rate.  Id.  AT&T filed suit in the district court.  Id. at 990.  The district court agreed with CPUC.  Id.  On appeal, the Ninth Circuit addressed the issue of whether the ISP Remand Order applied to traffic exchanged between two CLECs in addition to traffic between an ILEC and a CLEC.  Id. at 989.

The Ninth Circuit noted, as an initial matter, that "there is no question that, for jurisdictional purposes, ISP-bound traffic is interstate in nature.  ISP-bound traffic is therefore subject to the FCC's congressionally-delegated jurisdiction.  Within this ambit, the FCC's actions can preempt state regulation to the contrary."  Id. at 990-91 (internal citations omitted).  The Court also found that "it is well settled that the ISP Remand Order has preemptive effect with regard to the ISP-related issues it encompasses."  Id. at 991.

The Court examined the language in the ISP Remand Order, along with an amicus brief filed by the FCC.  See Id. at 993-95, 998.  The Court found that the purpose of the ISP Remand Order was to address the problem of "regulatory arbitrage created by application of the prevailing reciprocal compensation scheme to local ISP-bound traffic." Id. at 994.  The FCC sought to correct that problem generally, and did not intend to limit its order to ILEC-CLEC traffic.  Id.  The Court held that the ISP Remand Order was applicable to CLEC-CLEC traffic, and that nothing in the language of the Order suggested otherwise.  Id. at 996.  The Court's conclusion was supported by the FCC's interpretation of the Order.  Id. at 998.

AT&T also argued that the CPUC did not have jurisdiction to resolve the dispute, as the FCC has exclusive jurisdiction over compensation for ISP-bound traffic.  Id. at 989, 991.  Because the CPUC's orders were invalid for the independent reason that they were inconsistent with the ISP Remand Order, neither the Ninth Circuit nor the FCC addressed the issue of whether the CPUC had jurisdiction to resolve the dispute between AT&T and Pac-West.  Id. at 993-99.

II.  Preliminary Injunction Motion[6]

Federal Rule of Civil Procedure 65(a)(2) allows a court to consolidate a preliminary injunction hearing with a hearing on the merits.  The court is required to give notice to the parties, "either before or after the commencement of the hearings, sufficient to enable them to present all their evidence."  Fenstermacher v. Philadelphia Nat. Bank, 493 F.2d 333, 337 (3d Cir. 1974).

AT&T's Complaint seeks declaratory relief and a permanent injunction preventing the enforcement of the PPUC's Orders.  This case involves a dispute solely over the interpretation of the law.  The parties do not dispute any facts.  Thus, the ultimate resolution of the cause of action would require no further development of the evidence.  AT&T brought a preliminary injunction motion in the interest of time, in order to avoid payment to Core by September 18, 2013.  Tr. Hr'g 10/1/13 5:20-25.

During the preliminary injunction hearing, the Court inquired as to whether additional evidence would be necessary to

---

[6] The Court has jurisdiction, under 28 U.S.C. § 1331, to review a decision by a state public utility commission to ensure compliance with federal law.  See MCI Telecomm. Corp. v. Bell Atlantic Pennsylvania, 271 F.3d 491, 498 (3d Cir. 2001); Global NAPs California, Inc. v. Public Utilities Comm'n of California, 624 F. 3d 1225, 1231 n.3 (9th Cir. 2010); Verizon Maryland, Inc. v. Public Service Comm'n of Maryland, 535 U.S. 635, 642 (2002)).

decide this case on the merits.  Tr. Hr'g 10/1/13 6:1-6.  The
parties agreed that no further evidence would be necessary.  Tr.
Hr'g 10/1/13 6:13.  At the end of the hearing, the Court asked
whether the parties had any objection to the Court deciding the
merits of this case, rather than ruling on the preliminary
injunction.  Tr. Hr'g 10/1/13 119:25-120:5.  The parties did not
object.  Tr. Hr'g 10/1/13 120:9-121:2.  Accordingly, the Court
will proceed to decide whether the PPUC's Orders violate federal
law, and whether AT&T is entitled to a permanent injunction
barring enforcement of the Orders.

## III. <u>Discussion</u>

AT&T sets forth five independent reasons that the PPUC
Orders violate federal law:  (1) the PPUC did not have
jurisdiction to resolve the dispute; (2) the PPUC Orders violate
47 U.S.C. § 203 by awarding charges at a rate not contained in
any tariff or contract and, therefore, the rate was "unjust or
unreasonable" in violation of 47 U.S.C. § 201; (3) "the [PPUC]
Orders violate 47 U.S.C. § 251(b)(5) by allowing Core to recover
compensation without a reciprocal compensation arrangement"; (4)
"the [PPUC] Orders impermissibly engaged in retroactive
ratemaking by ordering AT&T to pay a rate not set forth in any
contract or tariff for a period extending back to 2005"; and (5)

"the [PPUC] Orders impermissibly applied a four-year state law statute of limitations."  Pl.'s Mot. 13-14.

The Court finds that the FCC has exclusive jurisdiction to set rates for ISP-bound traffic, which is interstate communication, except for the state-delegated authority in 47 U.S.C. § 252.  Because this dispute did not arise under the confines of § 252, the PPUC did not have jurisdiction to establish a rate for the ISP-bound traffic sent by AT&T to Core.  Because the Court finds that PPUC did not have jurisdiction, the PPUC's orders are invalid, and the Court does not reach the merits of AT&T's additional arguments.

A.   FCC's Jurisdiction

AT&T argues that ISP-bound traffic is jurisdictionally interstate and the FCC, therefore, has exclusive jurisdiction over disputes involving ISP-bound traffic.  Core and the PPUC argue that ISP-bound traffic is a hybrid of interstate and intrastate traffic, and state commissions were given a role in regulating that activity.  The Court agrees with AT&T and finds that, because the FCC has classified ISP-bound traffic as interstate communication, the FCC has exclusive jurisdiction.

It is well-settled that ISP-bound traffic is characterized by the FCC as "jurisdictionally interstate."  In

23

several orders, the FCC has characterized ISP-bound traffic as
interstate communication, and has thus determined that the FCC
has jurisdiction to regulate such activity.  See ISP Remand
Order, 16 FCC Rcd. 9151; Core Forbearance Order, 19 FCC Rcd
20179; ISP Mandamus Order, 24 FCC Rcd. 6475.  That determination
has been affirmed by the D.C. Circuit and the Ninth Circuit.
See Core v. F.C.C., 592 F.3d at 144; AT&T v. Pac-West, 651 F.3d
at 990.

        It is also undisputed that the ISP Remand Order
governs this case.  The FCC asserted, and the Ninth Circuit
held, that the ISP Remand Order applies to CLEC-CLEC traffic in
addition to ILEC-CLEC traffic.  See Pl.'s Mot. Exh. 2, FCC
Amicus Brief at 15; AT&T v. Pac-West, 651 F.3d at 996.  PPUC and
Core do not dispute that the ISP Remand Order governs
compensation for ISP-bound traffic between two CLECs.  Tr. Hr'g
10/1/13 17:25-18:14.  Since the ISP Remand Order applies to the
traffic at issue in this case, and that traffic is classified as
interstate communication, the question before the Court is
therefore whether the ISP Remand Order allows the PPUC to
address issues of compensation for ISP-bound traffic.

        The FCC was given jurisdiction over interstate
communication by the Communications Act of 1946.  Several courts
have characterized the FCC's jurisdiction over interstate

24

traffic, under the Communications Act, as exclusive.  See
Crockett Tel. Co. v. F.C.C., 963 F.2d 1564, 1566 (D.C. Cir.
1992)("The FCC has exclusive jurisdiction to regulate interstate
common carrier services including the setting of rates."); Nat'l
Ass'n of Regulatory Util. Comm'rs v. F.C.C., 746 F.2d 1492, 1498
(D.C. Cir. 1984)("Interstate communications are totally
entrusted to the FCC . . . ."); Ivy Broadcasting Co. v. American
Tel. & Tel. Co., 391 F.2d 486, 491 (2d Cir. 1968)("[Q]uestions
concerning the duties, charges and liabilities of telegraph or
telephone companies with respect to interstate communications
service are to be governed solely by federal law and the states
are precluded from acting in this area."); AT&T Corp. v. PAB,
Inc., 935 F. Supp. 584, 590 (E.D. Pa. 1996)("The FCC retains
exclusive jurisdiction over interstate communication by wire . .
. ."); AT&T Comm. of Mountain States, Inc. v. Public Service
Comm'n, 625 F. Supp. 1204, 1208 (D. Wy. 1985)("Exclusive FCC
jurisdiction over interstate matters is well-established, absent
a clear, express deferral.").

          The ISP Remand Order also expresses the intention to
limit state commissions' jurisdiction over compensation for ISP-
bound traffic specifically.  The FCC declares that "[b]ecause we
now exercise our authority under section 201 to determine the
appropriate intercarrier compensation for ISP-bound traffic . .

. state commissions will no longer have authority to address this issue." ISP Remand Order, 16 FCC Rcd. 9151, 9189.  This indicates that state commissions no longer have authority to establish rates for ISP-bound traffic, as the FCC has expressly preempted state authority in that area.

The ISP Mandamus Order also reiterated the FCC's jurisdiction over ISP-bound traffic, and made clear that the authority of state commissions under sections 251 and 252 have no impact on the FCC's jurisdiction.  The FCC declared that "addressing ISP-bound traffic through the section 251 framework does not diminish the [FCC's] independent jurisdiction or authority to regulate traffic under other provisions of the Act. Specifically, [the FCC] retain[s its] authority under section 201 to regulate ISP-bound traffic . . . ." ISP Mandamus Order, 24 FCC Rcd. 6475, 6484.

Although the FCC may not have addressed specifically whether state commissions have jurisdiction outside of § 252 to resolve disputes regarding intercarrier compensation for ISP-bound traffic,[7] the FCC has declared its exclusive jurisdiction over interstate communication generally in several FCC Orders.[8]

---

[7] Pl.'s Mot. Exh. 2, FCC Amicus Brief at 29.

[8] See, e.g., In the Matter of Vonage Holdings Corp., 19 FCC Rcd. 22404 (2004); In re applications of Mobile Telecomm. Tech. Corp. U.S. Central, Inc., 6 F.C.C.R. 1938, 1941 n.16 (1991)("The

For example, in In the Matter of Vonage Holdings Corp., 19 FCC Rcd. 22404 (2004), the FCC explained that, "[i]n section 2(a) of the [Communications] Act, Congress has given the Commission exclusive jurisdiction over 'all interstate and foreign communication' and 'all persons engaged . . . in such communication.'"  19 FCC Rcd. 22404, 22412 (quoting 42 U.S.C. § 152(a)).  The FCC went on to explain that it typically applies its end-to-end analysis to determine whether a communication is interstate or intrastate:

> [W]hen the end points of a carrier's service are within the boundaries of a single state the service is deemed a purely intrastate service, subject to state jurisdiction for determining appropriate regulations to govern such service.  When a service's end points are in different states or between a state and a point outside the United States, the service is deemed a purely interstate service subject to the Commission's exclusive control.

Id. at 22412-13 (2004) (emphasis added).

The FCC distinguished interstate services from those that are "mixed-use" or "jurisdictionally mixed," which are services that could be either interstate or intrastate services at any given time.  Id. at 22413.  Those services are subject to

---

Act grants this Commission exclusive authority to regulate the charges and services of interstate common carriers."); In the Matter of Am. Telephone & Telegraph Co. and the Assoc. Bell Sys. Cos., 56 F.C.C.2d 14 (1975)("[T]he States do not have jurisdiction over interstate communications."), aff'd, California v. F.C.C., 567 F.2d 84 (D.C. Cir. 1977) (per curiam).

"dual federal/state jurisdiction, except where it is impossible or impractical to separate a service's intrastate from interstate components and the state regulation of the intrastate component interferes with valid federal rules or policies."  Id. Regarding those services, the FCC can "exercise its authority to preempt inconsistent state regulations that thwart federal objectives, treating jurisdictionally mixed services as interstate with respect to the preempted regulations."  Id.

Core and the PPUC argue that ISP-bound traffic is not exclusively interstate traffic, and thus not subject to the FCC's exclusive jurisdiction.  However, the FCC has determined, according to its end-to-end analysis, that ISP-bound traffic is interstate communication for jurisdictional purposes.  ISP Remand Order, 16 FCC Rcd. 9151, 9154.  The FCC has litigated this position for several years, and that determination has been affirmed.  In fact, the FCC first classified ISP traffic as "jurisdictionally mixed" in its 1999 Declaratory Ruling.  See Declaratory Ruling, 14 FCC Rcd. 3689, 3690.  That ruling was overturned.  Bell Atl. Tel. Cos. v. F.C.C., 206 F.3d 1 (D.C. Cir. 2000).  The FCC changed its mind in its next order, the ISP Remand Order, and has since classified ISP traffic as jurisdictionally interstate.  The traffic, therefore, is not

mixed for jurisdictional purposes.  The FCC has expressed its
intention to classify ISP-bound traffic as interstate only.

The TCA gave state commissions jurisdiction over
interstate traffic in the context of sections 251 and 252 only.
The PPUC has jurisdiction to establish intercarrier compensation
rates for ISP-bound traffic, subject to the rate caps in the ISP
Remand Order, through its powers in § 252 to approve, mediate,
and arbitrate agreements between ILECs and CLECs.  That section
does not give the PPUC authority to establish a rate for ISP-
bound traffic between CLECs as it did here.

The TCA did not give state commissions any general
rulemaking authority over interstate traffic.  In another case
similar to this one, the Ninth Circuit held that "[i]t is clear
from the structure of the [TCA] . . . that the authority granted
to state regulatory commissions is confined to the role
described in § 252 – that of arbitrating, approving, and
enforcing interconnection agreements." Pac. Bell v. Pac. W.
Telecomm, Inc., 234 F.3d 1114, 1126 (9th Cir. 2003).  The Ninth
Circuit held that the TCA did not give states any general
rulemaking power over ISP-bound traffic.  Id. at 1127.  The
Court quoted a Third Circuit opinion, which stated:

> Under the Act, there has been no delegation to state
> commissions of the power to fill gaps in the statute
> through binding rulemaking . . . . State commissions

> have been given only the power to resolve issues in
> arbitration and to approve or reject interconnection
> agreements, not to issue rulings having the force of
> law beyond the relationship of the parties to the
> agreement.

Id. (quoting MCI Telecomm. Corp. v. Bell-Atl. Pa., 271 F.3d 491,

516 (3d Cir. 2001).  The Ninth Circuit held, therefore, that the

California PUC did not have jurisdiction to promulgate a general

regulation over ISP-bound traffic.   Id. at 1125.

        The TCA, therefore, did not give state commissions

jurisdiction over interstate communication, including ISP-bound

traffic, outside the confines of § 252.  That section gives

state commissions power over interstate communication only in

the context of approving, mediating, and arbitrating

interconnection agreements between ILECs and CLECs.  The TCA has

not given state commissions any authority to make rules or set

rates outside of that context, and state commissions do not have

authority to "fill gaps in the statute through binding

rulemaking."  MCI Telecomm. Corp., 271 F.3d at 516.

        In support of its argument, Core states several times,

without authority, that the ISP Remand Order gave state

commissions authority to set rates according to the Order's

compensation scheme.  See Core Opp'n 20, 21, 23.  For example,

Core argues:

30

> [T]he FCC preempted the Commission from setting a rate
> in excess of the FCC's rate cap, while authorizing the
> Commission to set a rate at or under the cap.  With
> the FCC conceding state commission authority to set
> the rate consistent with the cap, it is simply
> illogical to infer that the FCC meant to preempt state
> commissions from enforcing that rate and requiring
> payment.

Core Opp'n 20.  The brief cites no authority for that assertion,
and the defendants could not point to any authority during the
hearing either.  Tr. Hr'g 10/1/13 34:7-40:13.  The ISP Remand
Order says nothing about authorizing a state commission to set a
rate under the cap.  The only state authority that the ISP
Remand Order references is the authority to arbitrate
interconnection agreement disputes under § 252.  The Court is
not persuaded, therefore, by Core's conclusory statements that
the FCC has given state commissions authority to set rates for
ISP-bound traffic.

AT&T points out that the ALJ cited two sections of the
1996 Act in support of its conclusion that the PPUC had
jurisdiction to resolve the dispute by applying federal law.
First, it cited 47 U.S.C. § 251(b)(1), which has no relevance to
this matter.  See Pl.'s Mot. Ex. 1, ALJ Decision 30.  That
section imposes a duty on LECs not to prohibit, and not to
impose unreasonable or discriminatory conditions or limitations

on, the resale of its telecommunications services.  47 U.S.C. §
251(b)(1).  It is not informative as to PPUC's jurisdiction.

Second, the ALJ cited § 252(d)(2)(A).  That section
establishes standards for state commissions to use in
determining whether the conditions for reciprocal compensation
are "just and reasonable."  48 U.S.C. § 252(d)(2)(A).  That
section is limited to evaluating "compliance by an incumbent
local exchange carrier with section 251(b)(5)."  It is also not
informative as to the PPUC's jurisdiction.

The defendants have not pointed to any authority for
the PPUC's exercise of jurisdiction.  The PPUC's enabling
statute provides that PPUC only has jurisdiction over interstate
communication where federal law or the Constitution allows.  66
Pa. C.S.A. § 104.  The defendants have not cited any federal
statutes, regulations, or Constitutional provisions that give
the PPUC jurisdiction over ISP-bound traffic, outside of § 252
which does not apply here.

The Court finds, therefore, that the PPUC lacked
jurisdiction.  The FCC has exclusive jurisdiction over
interstate communication.  ISP-bound traffic, including such
traffic exchanged between two CLECs, is categorized as
interstate communication for jurisdictional purposes.  The FCC
has exclusive jurisdiction to regulate ISP-bound traffic.

32

Specifically, the FCC has asserted its intention to preclude the states from regulating rates for the exchange of ISP-bound traffic in the <u>ISP Remand Order</u>.

The authority given to state commissions under sections 251 and 252 in the TCA does not impact the FCC's jurisdiction.  Although the PPUC may have jurisdiction to set rates for the exchange of ISP-bound traffic pursuant to an interconnection agreement under its § 252 arbitration powers, that authority does not apply here.  Congress and the FCC have not delegated jurisdiction to state commissions over interstate communication outside the context of sections 251 and 252.  The PPUC, therefore, did not have jurisdiction and its Orders of December 5, 2012 and August 15, 2013 are invalid.[9]

An appropriate order shall issue separately.

---

[9] The Court notes that it is not implementing a bill-and-keep arrangement, or any other rate, for the traffic exchanged between AT&T and Core.